## Case No. 16,729.

### UNITED STATES v. WILSON.

[Cited in U. S. v. Sprague, 48 Fed. 828. Nowhere reported; opinion not on file in clerk's office, with case.]

## Case No. 16,730.

### UNITED STATES v. WILSON et al.

[Baldw. 78.] 1

Circuit Court, E. D. Pennsylvania. April Term, 1830.

CRIMINAL LAW—JOINT INDICTMENT — SEPARATE TRIALS—CHALLENGE OF JURORS—COMPETENCY OF WITNESSES — ADMISSIONS — ACCOMPLICES — ROBBERY — FORMER JEOPARDY — DANGEROUS WEAPONS—MAIL CARRIERS—PROVINCE OF JURY —INDICTMENT.

1. On a joint indictment it is not a matter of right to have the defendants tried separately, but it is discretionary with the court.
   [Cited in Hawkins v. State. 9 Ala. 137; Jackson v. State, 104 Ala. 3. 16 South. 524: Maton v. People. 15 Ill. 539. Cited in brief in Com. v. James, 99 Mass. 439. Cited in State v. Doolittle, 58 N. H. 92.]

2. The United States may challenge a juror in the first instance peremptorily, till the panel is exhausted. after which they can only challenge for cause.
   [Cited in U. S. v. Douglass, Case No. 14,989.]

3. It is a good cause of challenge that the juror has conscientious scruples about finding a verdict which may lead to capital punishment.
   [Cited in Gates v. People. 14 Ill. 435; Gross v. State. 2 Ind. 330; State v. Greer, 22 W. Va. 809.]

4. If a juror is wrongly named on the panel he cannot be sworn.

5. Where there are separate trials on a joint indictment, it is no cause of challenge that a juror was sworn on the first trial and found a verdict of guilty, though it is good cause to submit his indifference to triers.

6. On a challenge for favour, without cause assigned, it will not be submitted to triers.

7. It is good cause for challenge if a juror does not stand indifferent on account of bias. prejudice, having made up his mind, or expressed an opinion touching the prisoner's guilt or innocence.
   [Cited in Logan v. U. S., 144 U. S. 298, 12 Sup. Ct. 628.]
   [Cited in Com. v. Dorsey, 103 Mass. 415.]

8. It is no objection to the competency of a witness, that a reward has been offered to be paid on conviction of the prisoner, to which witness may be entitled.

9. The admissions of a prisoner, though they are not in writing or given in his words. are admissible; but the whole of a connected conversation on the subject must be given.

10. A pardon granted by a governor of a state, under its great seal. is evidence, per se, without any further proof.

11. The evidence of an accomplice cannot be corroborated by his statements at another time, unless it has been impeached.
   [Cited in brief in U. S. v. Neverson, 1 Mackey, 160.]

12. The acts of a co-defendant are ·evidence to show the connection between him and the prisoner in the same offence.

13. After a witness has been once examined, it is in the discretion of the court to permit him to be examined again on new matter, but not a matter of right.

14. The word "rob" in the act of congress of 1825, § 22 [4 Stat. 121], is used in its common law sense.
   [Cited in U. S. v. Coppersmith, 4 Fed. 200.]

1 [Reported by Hon. Henry Baldwin, Circuit Justice.]

15. "Jeopardy," as used in this section, means a well grounded apprehension of danger to life, in case of refusal or resistance.

16. Pistols are "dangerous weapons;" the offer or threat to shoot with them comes within the law, without proof that they were loaded—the presumption is they were loaded.

[Cited in U. S. v. Small, Case No. 16,314; U. S. v. Williams, 2 Fed. 64.]

[Cited in brief in Gardiner v. State. 14 Mo. 98.]

17. Penal laws must be construed strictly to bring the case within the definition of the law, but not so as to exclude a case within its words, in their ordinary acceptation.

[Cited in U. S. v. Ragsdale, Case No. 16.113; Harrison v. Vose, 9 How. (50 U. S.) 378.]

[Cited in Shannon v. People. 5 Mich. 45. Cited in brief in Parker v. Com., 6 Pa. St. 508.]

18. It is not necessary to a conviction under the twenty-second section, that the carrier of the mail should have taken the oath prescribed by the second section of the act of 1825. or that the whole mail be taken.

19. All persons present at the commission of a crime, consenting thereto, aiding, assisting, abetting therein, or in doing any act which is a constituent of the offence are principals.

[Cited in U. S. v. Libby, Case No. 15,597; Re Van Campen, Id. 16,835.]

20. In a criminal case a jury are so far judges of the law, that they may find a verdict according to their own opinion: but they are as much morally and legally bound by the law as the court. If they acquit against law, the court cannot set aside their verdict; but if the jury convict against law, no sentence will be passed by the court.

[Cited in Stettinius v. U. S., Case No. 13.387. Criticised in U. S. v. Morris, Id. 15.815. Cited in Sparf v. U. S., 156 U. S. 72. 15 Sup. Ct. 282. Quoted in dissenting opinion in same case, 156 U. S. 163, 175, 15 Sup. Ct. 317. 321. Approved in U. S. v. Taylor, 11 Fed. 472.]

[Cited in Hipp v. State, 5 Blackf. 151; Territory v. Kee (N. M.) 25 Pac. 926; Pierce v. State, 13 N. H. 565; Com. v. McManus, 143 Pa. St. 95, 22 Atl. 764.]

21. An indictment laying an offence in the words of the law creating it is sufficient, as a general rule.

[Cited in U. S. v. Quinn, Case No. 16,110.]

[Cited in Hopkins v. Com., 3 Metc. (Mass.) 465.]

22. It need not state the county in which the offence was committed; it is enough if it shows that the court had jurisdiction: cases of treason are exceptions.

The defendants were indicted under the 22d section of the act of the 3d of March, 1825, for robbing the mail of the United States with the use of dangerous weapons, and putting the life of the carrier in jeopardy. 3 Story 1992 [4 Stat. 121]. The indictment was as follows:

"Indictment. In the circuit court of the United States of America, holden in and for the Eastern district of Pennsylvania, of April sessions, in the year of our Lord one thousand eight hundred and thirty. Eastern district of Pennsylvania,. to wit. The grand inquest of the United States. of America, inquiring for the Eastern district of Pennsylvania. upon their oaths and affirmations respectively do present: That James Porter, otherwise called James May, late of the East-

ern district aforesaid, yeoman; and George Wilson, late of the Eastern district aforesaid, yeoman; on the 6th day of December, in the year of our Lord one thousand eight hundred and twenty-nine, at the Eastern district aforesaid, and within the jurisdiction of this court, with force and arms in and upon one Samuel M'Crea, in the peace of God and of the United States of America then and there being, and then and there being a carrier of the mail of the United States of America, and then and there having the custody of the said mail, and then and there proceeding with said mail from the city of Philadelphia to the borough of Reading, feloniously did make an assault, and him the said carrier did then and there of the said mail feloniously rob, and in then and there effecting the said robbery did then and there, by the use of dangerous weapons, to wit pistols, put in jeopardy the life of the said Samuel M'Crea, he the said Samuel M'Crea then and there being as aforesaid the carrier of the said mail of the United States, and having then and there the custody thereof, contrary to the form of the act of congress in such case made and provided, and against the peace and dignity of the United States of America. And the inquest aforesaid. upon their oaths and affirmations aforesaid, do further present, that the said James Porter, otherwise called James May, and the said George Wilson, afterwards, to wit on the same day and year aforesaid, at the Eastern district aforesaid, and within the jurisdiction of this court, with force and arms in and upon the said Samuel M'Crea, then and there being a carrier of the mail of the United States, and then and there having the custody of the said mail from the city of Philadelphia to the borough of Reading. feloniously did make an assault, and him the said Samuel M'Crea in bodily fear and danger of his life then and there feloniously did put, and the said mail of the United States, from him the said Samuel M'Crea, then and there, as aforesaid, a carrier of the mail of the United States, and then and there having the custody thereof, then and there feloniously, violently and against his will, did steal, take and carry away, and in then and there effecting the robbery so as aforesaid described, did then and there by the use of dangerous weapons, to wit pistols, put in jeopardy the life of the said Samuel M'Crea, then and there the carrier of the mail of the United States, and then and there having the custody thereof, contrary to the form of the act of congress in such case made and provided. and against the peace and dignity of the United States of America. And the inquest aforesaid. upon their oaths and affirmations aforesaid, do further present, that the said James Porter. otherwise called James May, and the said George Wilson. afterwards. to wit on the same day and year aforesaid, at the Eastern district aforesaid. and within the jurisdiction of this court, with

force and arms, in and upon the said Samuel M'Crea then and there being a carrier of the mail of the United States, and then and there having the custody of the said mail feloniously did make an assault, and the life of him, the said Samuel M'Crea, by the use of dangerous weapons, did then and there put in jeopardy, and the said mail of the United States from him the said Samuel M'Crea then and there, feloniously, violently, and against the will of him the said Samuel M'Crea, did steal, take and carry away, contrary to the form of the act of congress in such case made and provided, and against the peace and dignity of the United States of America. George M. Dallas. Attorney of the United States for the Eastern District of Pennsylvania.

"True bill. Joseph Watson, Foreman.
"April 13, 1830."

Mr. James C. Biddle moved that the prisoners be tried separately, for which three reasons were assigned: 1. That evidence of the confessions of one of the prisoners will be given by the United States. 2. That they are desirous of examining the wife of one of the prisoners as a witness. 3. That the defence of one prisoner will implicate the other.

BY THE COURT. Whatever doubt may have been entertained before the Case of Marchant, 12 Wheat. [25 U. S.] 480, it is now settled that separate trials on joint indictments are matters of discretion in the court, and not of right. The court will not interfere where the counsel for the United States agree to separate trials. If, in his opinion, public justice requires a joint trial, the court will not direct a several trial without cogent reasons. As a general rule, the public prosecutor has the right to elect, and the courts are very unwilling to control it. Had he felt it his duty to oppose the motion, we may not have thought it a proper case for granting it; but as he has not done it, we think the third reason assigned a reasonable ground for allowing a separate trial, and direct it accordingly. Vide 5 Serg. & R. 60.

The jury were then called in the case of George Wilson. Caleb Coates was called and not challenged by the prisoner, but was challenged peremptorily by Mr. Dallas, the district attorney; his right to do so was denied by the counsel for the prisoner. Mr. Dallas contended that his right to challenge was peremptory, in the first instance, and that the juror might be set aside; but that if the panel was exhausted, he was then bound to show cause of challenge. [U. S. v. Marchant] 12 Wheat. [25 U. S.] 480; U. S. v. Johns [Case No. 15,481]; 2 Hawk. 388, c. 43; 1 Chit. Cr. Law, 533; 17 Serg. & R. 155.

Messrs. V. L. Bradford and Kane contended, that inasmuch as there were no peremptory challenges allowed in Pennsylvania, there could be none in this court, in which juries must be designated according to the laws of the state. 1 Story's Laws, 63, § 29,

Judiciary Act [1 Stat. 88]. The United States may challenge, for cause, after the panel is exhausted. 17 Serg. & R. 163; 1 Story's Laws, 792 [2 Stat. 82], but the right now set up was never before claimed.

Mr. Dallas was about to reply, but was stopped by the court.

THE COURT observed, that they had known no case where the right now claimed had been allowed to the prosecution; that they would not be the first to do it in a capital case, unless it was clearly established; but that on examining the opinion of the supreme court in the case of U. S. v. Marchant, 12 Wheat. [25 U. S.] 480, 484, 485, they did not feel themselves at liberty to refuse the qualified right of challenges now claimed by the United States. The law as laid down by that court is, that in England, the crown had an acknowledged right of peremptory challenges before the statute of 33 Edw. I., which took them away, and narrowed the right down to those for cause shown; but that an uniform practice had prevailed ever since, down to the present time, to allow a conditional and qualified exercise of that right, if other sufficient jurors remained for the trial, by not compelling the crown to show cause at the time of objection taken, but to put aside the juror until the whole panel is gone through, so that it appears there will not be a full jury without the person challenged. That the right of peremptory challenges allowed the prisoner was not to select the jury who were to try him, but merely to reject such as he pleased, though he could assign no reason for so doing, and that the court would not inquire into what was the United States' prerogative, but simply what was the common law doctrine. The court considering the opinion of the supreme court as a recognition of the qualified right of the United States to challenge, directed the juror to be put aside till the panel was exhausted, declaring that if that should happen and the juror be called again, the United States could not challenge him without showing cause.

The panel being exhausted, Mr. Coates being again called, stated that he had conscientious scruples against giving a verdict which in its consequences might be the means of taking away the life of the prisoners, whereupon Mr. Dallas challenged him for this cause.

BY THE COURT. If the juror should act according to his declaration, his conscientious scruples, it would prevent him from deciding according to the evidence and his solemn affirmation: we should hold it a good cause of challenge if the question remained unsettled, but it has been so held in the circuit court of the First circuit,—U. S. v. Cornell [Case No. 14,868],—and the supreme court of the state,—Com. v. Lesher, 17 Serg. & R. 163. The challenge is allowed.

Before the exhaustion of the panel several jurors were called who had been returned on

the venire by wrong names. John Byrly had been returned by the name of John Byerly; Matthew Pennypacker in the name of Nathan Pennypacker; George H. Pauling in the name of George M. Pauling. The district attorney objected to their being sworn, the prisoners' counsel neither assenting nor objecting.

BY THE COURT. The jurors cannot be sworn. It would be a mistrial, if it should appear by the record. that the juror sworn was not the same person who was summoned and returned on the venire.

As other questions arose on challenges to jurors in the trial of Porter, it is thought best to notice them here. so that all the decisions of the court on the same subject may be taken in connection, rather than to separate them in reporting the cases distinctly.

In the case of James Porter, on the same indictment. after the jury had returned a verdict of guilty against Wilson, Mr. J. C. Biddle moved for a continuance, on the ground of the great excitement prevailing against Porter, which would prevent him from having an impartial trial.

THE COURT refused the application. They had no reason to believe that any excitement prevailed in the public mind, other than what arose from the trial of Wilson; had they been tried jointly, there could have been no foundation for any complaint of this kind, as the same jury would have passed on both prisoners. If the evidence given in Wilson's case has prejudiced the public mind against Porter on account of their connection in the crime charged upon him, it is the obvious consequence of separate trials, which the prisoner has brought on himself by his application to be tried separately. The motion was overruled.

On the jurors being called and questions being put to them touching their indifference as to the guilt or innocence of the prisoner, THE COURT laid down the rule to be: That it is a good cause of challenge to a juror that he has a bias or prejudice against the prisoner, and does not stand indifferent towards him touching his guilt or innocence of the crime with which he is charged. Or if he has made up his mind, or expressed an opinion on the subject. That having served on the jury in the case of Wilson was no cause of challenge, unless he had formed or expressed an opinion as to the case of Porter.

THE COURT directed the call of the jurors to be continued till two were sworn, to whom no objection was made. They then directed them to. be sworn as triers of the indifference of the jurors who were objected to. The suspended jurors were examined on their voir dire, and sworn or rejected accordingly, as the triers reported to the court.

A juror was challenged for favour, but no cause assigned. The court thought this not a proper case to be submitted to triers. This ought only to be done where, from the answer of the juror to the cause of challenge,. the court cannot ascertain his indifference; but on the agreement of the district attorney, it was submitted to the triers. The jurors who had served on the trial of Wilson were held to be exceptions from this rule, such service being deemed, in itself, sufficient cause for submitting their indifference to the triers.

The court declared the rule to be, to ask the juror whether he had made up his mind, or expressed an opinion on the supposed guilt or innocence of the prisoner. Vide 1 Burr's Tr. 414, 420.

A juror who had served on Wilson's trial, on being examined by the triers, was referred by them to the court; his answer was, "If the same evidence is to be adduced against this prisoner as we heard on the last. he is guilty; and so I think, unless evidence should appear to the contrary." It was held good ground for challenge.

If a juror answers that he had stated that if he had been on the jury in Wilson's case he would not have found him guilty of the capital charges, but not. on account of any conscientious scruples. it is not cause of challenge.

The substance of the evidence on the part of the prosecution is as given by the stage driver.

Samuel M'Crea was driver of the Reading mail on the 6th of December last. "I left the city at half past two in the morning. There were nine inside. and one outside passenger. It was a post coach. When I got opposite Turner's Lane, the first thing I saw was a man starting out, who got my off leader by the head, and turned him around to the right. Two men then stepped up, one on each side opposite the box, and each of them presented a pistol at me, and ordered me to stop. They cried Stop! stop! or they would blow my damned guts out. I then threw the whip across my horses, and tried to get on, but couldn't. They then struck my lamps with their pistols, and broke them, and put them out. The lamp on the right did not go out directly. The man who was holding the horses' heads then let go, and ran round and put the other lamp out. He put a handkerchief round his face, and struck out the lamp with his pistols. One of them ordered me off the box, on the ground. They then demanded the money from the gentleman who was sitting by my side. The gentleman wanted to keep it, but he thrust his hands into his pockets, and took it out, and his watch, I believe. Then the other robbers took the gentleman's pocket handkerchief and tied his hands behind his back, then stepped up to the coach door and opened it, and told the passengers to come out, one at a time. They did so; and they robbed the nine passengers, one after another. While one did this, the other two stood guard. The two who stood guard were on each side of the coach; I saw one on the right hand; he had a pistol in each hand. I could not see the other. One

of them then jumped into the coach, and took the saddle bags and valises, and what he could find, and threw them into the road. There was one leather trunk, I remember. He then came round to me at the front part of the coach, and tried to unfasten the boot; but he did not know how. He then ordered me to do it. I unfastened the boot. He jumped up and got hold of the mails, and threw them into the road on the left hand side. In answer to a question by a juror, witness replied, that the man said, " 'Driver, open this boot.' The other man presented his pistols at me at the time, and I was afraid he would blow my brains out then. I didn't know what else to expect. The one on the left fell to cutting the mails open, and then jumped down on the right hand, and caught and tied me. He then put the whole ten passengers into the stage again, and ordered me to get up on my seat. I told him I could not; and then two of them took hold of me, one on each side, and threw me up on the foot board. One of them stepped round on the other side, and took me by the arms and set me on the seat. They then jumped down and took each leader by the head and led them to the fence. They then took the lead reins and tied the two horses to the fence. They then left the stage and walked over to where they had left the mails, as well as I could see in the dark. I suppose they examined them and cleared out. I didn't see them go. I rose up and tried to see or hear them go off, but could not, they went off so easy. We remained there some length of time; I cannot tell how long. Then one of the passengers came out of the coach and said. 'Driver, where are you?' and he took his knife and cut the handkerchief with which I was tied. I then jumped down, and got my horses loose and turned them into the road. I got the passengers in—they were all out when they were tied—and drove back to town. I believe my life was in danger—I do, or I should not have given up the mail. The one who tied me did not keep his pistol in his hands all the time he robbed the passengers. He had his coat buttoned up, and when he went to tie them he thrust his pistol into his breast. The others kept their pistols in their hands. Saw no other weapons but pistols. The mail bag was cut open after it was in the road. The stage was bound to Reading and Harrisburg. Witness had travelled on that road about two months. I believe none of the passengers were armed."

Cross-examined by Mr. Kane. "Q. Who employed you to carry the mail? A. I was employed by John Miltimore. Q. Had you ever carried the mail on any other route before? A. No, I never did. Q. Where does Mr. Miltimore live? A. In Harrisburg. Q. How did he hire you? A. He hired me to drive the stage by the month. Q. Did he tell you that you were hired to take the mail? A. No, he didn't say 'the mail.' Q. Did you give any security? A. No. Q. Did you take any

oath? A. No. Q. How far did you drive the mail stage? A. I drove it to Barnhill, about eleven miles off, and then another driver took on. Q. What sort of a night was it? A. A very dark night. I could not see more than five or six yards off. I could not see exactly what the robber took from the outside passenger. Q. Where were you at the time? A. I was alongside of the passenger, with my whip and reins in my hand, when the robber took from him his money and his watch. Q. And where did this happen? A. This was on the right hand side of the stage; I was sitting on the right hand side; I drove. Q. And did you and your outside passenger get down on the same side? A. Yes, we did. Q. And you saw the robbers do all you have described? A. I was looking at them all the time but could not see much. Both the lamps were put out before I got down. Q. Now tell me when did you first consider your life in danger? A. I believed my life in danger when the man presented the pistol at me. I did not know at what moment he would blow me through. Q. And when did you first think your life out of danger? A. I thought my life no longer in danger after they were all gone, and I had got safe back to town."

The usual time for adjournment having passed, the counsel on both sides and the court consulted with the jury as to their wishes on that matter; some were for going on with the cause, others for an hour's adjournment, and others were for adjourning until the morning. At length it was agreed to adjourn until the morning, the jury in the meantime to be attended by officers who were to see that every proper convenience should be afforded them, and that they should not separate. The court then adjourned at half past three.

Third day, Wednesday, April 28th, 1830.

At the opening of the court this morning, Mr. Kane, one of the counsel for the prisoner, addressed the court, stating that it was with some regret he had read in a respectable morning paper (the United States Gazette), a a copy of which he held in his hand, a report of the trial which occupied the attention of the court yesterday, with a full detail of the evidence so far as it had been gone into. He was quite willing to bear testimony to its general correctness; it was not of misrepresentation that he complained.

HOPKINSON, District Judge. What then do you object to? If the report be a faithful one, it will only communicate to a greater number out of doors what they might have heard had they been here. A thousand, perhaps, witnessed our proceedings yesterday, and two or three thousand, it was likely, read the account in the paper. Have you any motion to make?

Mr. Kane. At present I do not mean to trouble the court with any motion, but I do object to the whole of it as a publication calculated to prejudice the minds of those out of

doors who may hereafter be called upon to sit as jurors on the other trials, nearly allied to that which now is occupying our attention. I do not attribute, in any degree, to the respectable editor of the paper in question, or to the gentleman who furnished him with the report, any intention whatever to frustrate the ends of justice, or to commit the mischief which the publication cannot but produce. He repeated, he had no motion to offer, but he trusted the observations he had dropped would produce a suspension for a day or two at least, of the determination which he gathered from a remark in the paper—that the report would be continued from day to day.

BALDWIN, Circuit Justice, said that the gentleman reporting the trial had behaved with much propriety. He had spoken to the bench yesterday of his intention to publish the proceedings daily. The court neither forbade his doing so, nor sanctioned the application with their consent. He trusted however, that if the counsel for either of the prisoners saw, or thought they saw, any mischief in the proceeding, that their wishes would be attended to.

Mr. Kane repeated his request—and the publication of the report in the papers was suspended until the conclusion of Porter's trial.

The trial now proceeded.

Samuel M'Crea re-examined. "I got the mail at the postoffice in Philadelphia that morning—both the leather and canvas were cut open—two of the mails I carried were cut open, two others were not. Two were in the front boot, and two behind; those in the fore boot were cut open."

Cross-examined by Mr. Bradford. "Q. Had you any conversation with the robbers, and when? A. Yes, when they were tying the passengers, one of them asked me, whether I didn't think it was rather a rough introduction, I told him I thought it was. He then asked me whether I made my living by stage driving, and I told him I did, and it was rather a hard life too, the way I was used. He said, 'This is the way we make our living, and it's hard with us sometimes.' Q. About what time in the morning was it when the mail was stopped? A. The clock struck three about the time they were tying the gentlemen who were outside. It struck four before we left the ground. Q. By Mr. Kane. Which of the persons was it with whom you had this conversation? A. I can't tell which 'twas. It was the one on the same side I was. Q. Was it the one who had been all the time on the left hand side? A. Yes. Q. Did they walk about much? A. The one who stood guard-like, walked up and down where they had the passengers in a row. Q. Were the passengers standing up? A. Yes. I was on the right hand side of the stage, the person talking was on the left. Q. How tall a man was he? A. I took him to be a small light man, but I couldn't see him exactly, in the dark. Q. By Mr. Dallas. How far from the tollgate was this? A. About a half a mile. It was just at Turner's lane."

A witness was called to prove the confessions of the prisoner, to which Mr. Kane objected on the ground of interest, a reward having been offered for the apprehension, to be paid on conviction; he also objected to any evidence of confession, unless it was in writing, or detailed in the words of the witness.

BY THE COURT. It is no objection to the competency of a witness that he may be entitled to a reward on conviction; public safety requires that rewards should be offered; and it has long been a settled rule of law, on grounds of public policy, that such an objection goes only to the credit of a witness. 1 McNally, Ev. 61, 63, and cases cited. The evidence offered is to prove the admissions of the prisoner of the facts laid in the indictment, not to have the effect of a confession, but as a circumstance for the jury. Such admission need not be in writing, or in the words of the prisoner; the witness may relate the conversation as he recollects it. If it was in detached parts, relating to different subjects, he need state only what relates to the matter in issue. If the conversation was one unbroken chain, the whole must be given.

Abraham Poteet, on being called as a witness, was objected to on the ground of his conviction in the Baltimore city court of several offences, two of which were for larceny, of which the records were produced. Mr. Dallas thereupon offered a pardon for the larcenies, granted by the governor of Maryland under the great seal of the state, which was objected to by the prisoners' counsel, who contended, that it must be shown that the person who signed the pardon was competent to grant it; that the constitution of the state conferred the power on the governor; that the act of pardon had passed through all the forms required by the laws of the state; that it had been judicially pleaded; and that the document must be proved in some mode prescribed by law, to make it admissible. In support of these positions they cited, 1 Story's Laws 93 [1 Stat. 122]; 1 Burr's Tr. 190; 4 Hawk. 55, 95; 4 Bac. Abr. 294; Craig v. Brown [Case No. 3,328].

BY THE COURT. The fourth article of the constitution of the United States makes the official acts of one state evidence in all others. The paper offered purports to be a pardon of the witness, granted by the governor of Maryland, under his signature and the great seal of that state. Every officer who certifies an official act, is presumed to be authorized to do the act he certifies. [Ex parte Bollman] 4 Cranch [8 U. S.] 130. The great seal of a state proves itself; and all acts to which it is affixed are evidence in all the courts of the Union: so are acts of foreign governments, certified under their great seal. [Church v. Hubbart] 2 Cranch [6 U. S.] 238. The affixing the seal to a document, is evidence of its being done by the officer who has its legal custody, and the seal itself authenti-

cates the act certified. [U. S. v. Amedy] 11 Wheat. [24 U. S.] 406, 407; [Doe v. Winn] 5 Pet. [30 U. S.] 241. A book or pamphlet, purporting to be printed by the public printer, is good prima facie evidence of a public law. [Young v. Bank of Alexandria] 4 Cranch [8 U. S.] 388. The objection must be overruled. Vide note at the end of the case.

The pardon having been read, Poteet, who was an accomplice, was sworn and examined. After he had given his evidence, he stated that he had stated the same facts to a justice of the peace in Baltimore; whereupon the counsel of the United States offered the justice to corroborate the evidence of Poteet, given at the trial, to which the prisoners' counsel objected.

BY THE COURT. The testimony of the witness has not been attacked on account of the want of credit to his statement, or the manner in which he has related the transaction, which must be done before corroborating evidence can be received. His general credit as a witness, on account of the situation in which he stands, is open to the jury and the remarks of counsel for defendant; but till some attempt to impeach it on other grounds, evidence in support of his credit is inadmissible.

On the trial of Porter, a witness was called to testify to the confession of Wilson, his acts, and declarations accompanying his acts.

BY THE COURT. The confessions of Wilson being offered merely to prove his own guilt, are not evidence against Porter, unless it is offered as the declaration of a confederate in the same crime, in which case it would be admissible on a joint trial against both. His acts are evidence which may conduce to prove the connection between him and Porter in the commission of the offence. As the district attorney waives the evidence of his declarations, we need give no opinion on their admissibility.

A witness, after being examined in chief, was called again to new matter not brought out by cross-examination, and objected to.

BY THE COURT. As a matter of right, the witness cannot be examined on new matter; it is however in the discretion of the court, which, in this case, we think it right to exercise by receiving the witness.

The trial of these cases was long and interesting. The prosecution was conducted with great ability by Mr. Gilpin and Mr. Dallas: the prisoners were defended with equal ability and great zeal; Wilson, by Mr. V. L. Bradford and Mr. J. K. Kane; Porter, by Mr. J. C. Biddle and Mr. J. R. Ingersoll. The questions of law being the same on both trials, Mr. Biddle was heard upon them on the trial of Wilson. As the arguments of counsel are contained in the pamphlet report of the cases, and as it would be difficult to separate the arguments on the questions of law from the view which counsel took of the evidence, they are not inserted in this report; they are sufficient-

ly referred to in the charge of the court to explain the points of law on which the cases turned.

THE COURT (BALDWIN, Circuit Justice) delivered the following charge to the jury:

The prisoner on his trial before you is charged with a violation of the provisions of an act of congress for establishing and regulating the postoffice department, by robbing the carrier of the mail of the United States of the mail, and in effecting such robbery putting in jeopardy the life of the person having the charge thereof by the use of dangerous weapons. The offence consists in robbing the carrier of the mail or other person entrusted therewith, of the mail or of part thereof; the question of law which comes first under your consideration is what is a robbing of the carrier of the mail? The act of congress makes use of the word "rob" without defining it; but it is a word which long before the act of congress had received a settled construction, by the common law both of this country and that from which we derive our legal institutions. "The stealing or taking from the person of another, or in the presence of another, property of any amount, with such a degree of force or terror as to induce the party to part with the property unwillingly." This is the true meaning and the judicial exposition of what the ancient writers of the law declare to be robbery. The felonious taking from the person of another, money or goods of any value, by putting him in fear. Foster. 128. It has been adopted by the supreme court as the sense in which the word robbery is used in the act of congress. United States v. Palmer, 3 Wheat. [16 U. S.] 630. And so it must be taken in this case as the rule of law by which you will inquire whether the carrier of the mail has been robbed.

You will perceive by this law that there are two species of robbery. 1. A robbery of the mail under such circumstances as amount to the offence by the principles of the common law. 2. A robbery effected by putting in jeopardy the life of the person having the custody of the mail, by the use of dangerous weapons. It is in these words. "Or if, in effecting such robbery of the mail the first time, the offender shall wound the person having custody thereof, or put his life in jeopardy by the use of dangerous weapons, such offender or offenders shall suffer death." 3 Story's Laws, 1992 [4 Stat. 108]. To constitute this offence, three things must concur: The mail must be robbed, it must be effected by putting in jeopardy the life of the person who has it in custody, and this must be done with dangerous weapons. On the first the court have given you their opinion of the law by which you ought to be governed. If a robbery has been committed, then the all important question arises— was the life of the driver put in jeopardy? To judge correctly on this subject, our only safe rule is to be found in the law itself; the acts and words of the makers of our laws furnish

the best evidence of their meaning and intention, and that, when ascertained, is the law itself. The first act of congress, which punished this offence, was passed in February, 1792. By the seventeenth section it was punishable with death to rob the carrier of the mail of the United States of the mail—or robbing the mail of any letter or parcel, or stealing and taking from the mail or from any post-office any letter or packet. 2 [Bior. & D.] Laws, 251 [1 Stat. 237]. In 1794, a distinction was made between these offences: Robbing the carrier of the mail remained capital as before; the other acts were punishable by fine and imprisonment only, according to the aggravation of the offence. 2 [Bior. & D.] Laws, 399, § 17 [1 Stat. 361]. In 1799 another law was passed, in the same words as the present, except that for the first offence of robbing the carrier of the mail, the punishment of forty stripes was added to ten years imprisonment, and the word "much" was inserted before the word "wound." 3 [Bior. & D.] Laws, 275 [1 Stat. 736]. The law of 1810 omitted the whipping and the word "much." The part of the law of 1825 which bears on the case of the prisoner, is a literal copy of the first part of the nineteenth section of that act. 4 [Bior. & D.] Laws, 297 [2 Stat. 598]. Thus it appears that this phrase, "or put his life in jeopardy," has been used in three different laws, the last passed twenty-six years after the first. It must have been well considered; its legal meaning must have been well understood; if it had been deemed at all ambiguous at first, it would have been superseded by some other expression in the subsequent acts of congress, but it seems to have been retained as a phrase better expressive of the intention of the law makers than any other which could have been substituted for it. The meaning of this expression in the law of 1810 was settled in the circuit court of the United States for the district of Maryland and Pennsylvania in 1818, on the trial of the Hares and Alexander at Baltimore for robbing the mail, and of Wood in this place as an accessory. In the three first cases the court declared, "that robbing the carrier of the mail of the United States or other person entrusted therewith, of such mail, by stopping him on the highway. demanding the surrender of the mail, and at the same time showing weapons calculated to take his life, such as pistols or dirks, putting him in fear of his life, and obtaining possession of the mail by such means, against the will of the carrier, is such a robbery of the mail and such a putting of the life of the carrier or other person entrusted therewith in jeopardy, as comes within the terms of the law making the offence capital." . The jury adopted this as the law; found the prisoners guilty; they were sentenced to death, and executed, except one, who received a pardon on the capital charge. Wood was tried before this court as an accessory to this robbery; and on his trial Judge Washington thus laid down the law to the jury. "As to the nature of the offence of

which Joseph I. Hare was convicted (alluding to the Baltimore trials), the court does not entertain a doubt; we think, that putting the mail carrier in fear, and his life in peril or danger, is putting his life in jeopardy within the meaning and intent of the act of congress; and if the jury should be of opinion, under the circumstances which attended this transaction, that Boyer (the driver) was put in fear or danger of his life, the offence of the prisoner was capital." So strong was the conviction on the mind of this humane and eminent judge that this was the law, that he so gave it in charge to the jury: though the district attorney was willing to abandon the capital charge, the jury agreed with the court, and convicted the prisoner capitally.

These cases are important, not only as affording a judicial construction of the law from which the present one is copied word for word, which is entitled to very great respect, especially in a court in which one of the judges who gave this construction presided so long and with such eminent public satisfaction and usefulness, but because congress have adopted and re-enacted the same expression of "put his life in jeopardy," after it has received a judicial exposition in two courts. There is no rule of law better settled than this; that where a word or a set of words has received a fixed and determined meaning, and is afterwards used in a law, it is with a reference to such meaning, as much so as if that meaning had been superadded as a definition. It is on this principle that the word "rob" and "robbery" is considered as defined by its mere use and adoption in a law. So if the word "deed," "will," "bond," "note," &c. as used in this same law, requires any explanation of what congress meant by their use, we must look to the common law for it. The word "jeopardy" was not for the first time seen in the act of 1825; it has been in use from the beginning of the government; it is in the fifth amendment of the constitution "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." Its meaning was well understood to be the same as peril and danger, and it has been since used and expounded in the same sense. Vide 6 Serg. & R. 597. But if this were a new question we should entertain as little doubt about it as our predecessors have done. We think the intention of the law is manifestly apparent in the terms which are used, and the punishment affixed to the commission of the different offences therein enumerated, the first of which is robbery of the mail with no other circumstance attending it but such as constitutes the crime of robbery at common law, which is punishable with not less than five or more than ten years' imprisonment for the first offence, and death for the second. You will observe that the robbery effected by putting the life of the carrier in jeopardy, is not a distinct offence, but a more aggravated species of mail robbery; if it does not consist in putting the driver in fear, peril and danger

of his life by the use of dangerous weapons, or the threat or offer to use them, then it must be necessary that some act should be done with dangerous weapons which does actually put his life in jeopardy, by a blow, a stab or shot, for there can be no middle kind of jeopardy, greater than the offer or threat to strike, stab or shoot, and less than the direct perpetration of either. But this construction cannot avail the prisoner, for the wounding of the carrier is made an act, of itself, sufficient to bring the offence within the capital punishment. "Shall wound the person having the custody thereof"—this makes the offence complete; "or shall put his life in jeopardy;" this is a distinct act; it need not be the mere wounding, for that case is fully provided for in the preceding sentence. Whether the wound is light or dangerous is immaterial, if done with a dangerous weapon; for the term "much wound," as used in the law of 1799, was altered in 1810 and 1825, by omitting the word "much." So that a wounding which puts the life in jeopardy, forms no part of the description of the offence with which the prisoner is charged. This will, we think, be as clear to your minds as to ours, by examining that part of the law immediately following, which punishes the attempt to rob the mail, by assaulting the person having the custody thereof, by shooting at him, or his horse, or mule, or threatening him with dangerous weapons, by imprisonment not less than two, or more than ten years. Stealing the mail is made a distinct offence, with the same punishment as the last. Cutting a mail bag, or doing the other acts enumerated in the twenty-third section of the same law, with intent to rob or steal the mail, are punishable by fine not exceeding 500 dollars, or three years' imprisonment. Here are four distinct offences. 1. Actually robbing the mail, of two species. (1) Robbery as defined at common law. (2) By putting the life of a driver in jeopardy. 2. Attempt to commit robbery by the assaulting the carrier, &c. 3. Stealing the mail. 4. Cutting the bags, &c. with intent to rob or steal.

From this view of the act of congress, it is clear that it intended not only to make a difference between the different species of robbery, but the different modes of attempting or intending to commit it. If by assaulting the driver, &c. the court may inflict as high a punishment as for actual robbery; if by cutting open the mail bags, the punishment is limited to a fine of 500 dollars, or three years imprisonment—the circumstance which so highly aggravates the offence is the offer or threat of violence to the carrier or shooting at him, his horse or mule; it is not in the mere attempt or intent to commit the felony. No one could doubt that if the prisoner was indicted for attempting to rob the mail by assaulting the carrier, or threatening him with dangerous weapons, the evidence in this case, if believed by the jury, would bring him within the express words of the law. Why shall we not apply the same rule to the com-

mission as to the attempt to commit the offence? Can it be credible that congress did not mean to discriminate between the mere robbery of the mail, and doing it attended with the use of deadly weapons by an assault on the person of the carrier, and threats of death in case of resistance? The law itself furnishes a most decisive answer; in the one case, it is imprisonment for the first offence, and death in the other, if life is put in jeopardy. In affixing this meaning to the word "jeopardy," we differ from the defendant's counsel, principally as to the degree of danger, peril and hazard which it implies. They contend it must be extreme, imminent, and one of them, that there must be a struggle and personal conflict between the driver and the robber, in order to put life in danger. This principle can be easily settled by analogy to the case of homicide in self defence. A man may defend his life or person, when it is in danger, by taking the life of the assailant; and it is not necessary that he should wait to receive a blow or shot, but may take the life before any injury is actually inflicted; if the danger is impending, his life may be truly said to be put in jeopardy. If a man with a drawn pistol in his hand threaten to blow out his brains if he does not surrender his property, the one assailed may take the life of the other. The driver might in this case have taken the life of any of the robbers, and would have been perfectly justified in law in so doing, because his life was in danger. And if the driver was placed in such circumstances as justified taking life, his life was in jeopardy according to the true meaning of the act of congress. It is a question of danger, and not of fear; whether the driver had the iron nerves of the little Perry county witness, or was timid, is not material. Clark's life was as much in danger as any other passenger; and though he is a stranger to the feelings of fear, he would have been as much justified in killing the robber as any one who would do it under the influence of fear.

The court have no hesitation in saying to you, as matter of law, that such acts are putting life in peril, danger and jeopardy, within the express letter of the law, if you credit the testimony of the witnesses. If any one of you, driving a stage at the dead hour of night, should see three men suddenly rush upon you with drawn pistols; one seize your horses, and two others approach you with such expressions as have been testified to you, would you not feel your life in jeopardy, when it was held at the mercy of a highway robber with his pistol at your breast; and if you were thus compelled to part with property entrusted to your care, could you with truth say you had not been robbed by putting your life in imminent danger? There is no magic in words, nor is law that mystical science whose words of art are enveloped in hidden meanings; if jeopardy does not mean danger, peril, reasonable fear and well

grounded apprehension, we are at a loss to give the word any definite meaning; as used in the constitution, "jeopardy of life or limb," it can admit of no other interpretation than such as is mentioned; so, we think, it is received and used in common acceptation; so it has been judicially expounded, and, we think, adopted and used in the law. If, therefore, you shall believe that a robbery of the mail has been committed by the prisoner;. and that in effecting it he has done such acts as created in the mind of the driver a well grounded apprehension of danger to his life, in case of resistance or refusing to give up the mail; if his life was actually in danger, or he really believed it to be so, then the robbery was committed by putting his life in jeopardy. It is not necessary that the danger should exist at the moment of giving up the mail, if it ceased in consequence of the driver's submission from a reasonable fear of his life if he resisted or refused. The law implies that the fear continued during the whole transaction; it was but one act; one offence; deriving its character from the circumstances attending its inception; which was an attempt to commit a robbery by putting the life of the carrier in jeopardy, ending in the consummation by the same means. In applying the evidence to this part of the case, you will bear in mind that the prisoner is on trial for the robbery of the mail, not of the passengers; the latter is not an offence within the jurisdiction of this court; and that the subject of your inquiry is whether his life was put in peril.

The next question is, whether the robbery and putting in jeopardy the life of the driver was done with dangerous weapons; pistols are such weapons; it is a use of them to point them at another, accompanied with words which denote an intention of injury, or without words, if they are shown and so held as to plainly indicate a design to do so in case of resistance or refusal to consent to the objects intended to be effected by their production and display. It need not be pointed at the driver, if intended to be used in case of resistance or refusal to surrender the mail; or if it was seen by the driver, and he had. reasonable cause for believing it was to be so used; and it is not necessary that it be proved to have been charged, the presumption is that it was so until the contrary is proved. These are the words in which the law has been heretofore given in charge to a jury by our lamented predecessors, and we fully concur therein. "The law does not say that to constitute the crime the pistols shall be loaded, or a dirk be drawn from its sheath, we see no reason for giving to it such a construction. This presumption assumes the form of positive proof, the demand of the mail having been accompanied with a threat to blow out the brains of the carrier if he refused to deliver it, which could not have been effected unless the' pistols were charged, and in all respects prepared to endanger life." U.

S. v. Wood [Case No. 16,756]. Our opinion then is. that in point of law the facts given in evidence in this case, if believed by the jury, do amount to the offence for which the prisoner is indicted; if such should be likewise your opinion, you may find him guilty generally; if, on the other hand, you shall believe that the prisoner has robbed the mail, but has not effected it by putting the life of the driver in jeopardy, or has not done so by the use of dangerous weapons, you will find him guilty of the robbery charged in the indictment, and not guilty of effecting it by the putting the life of the driver in jeopardy by dangerous weapons; if you think there has been no robbery of the mail by the prisoner, you will find him not guilty generally.

We have thus stated to you the law of this case under the solemn duties and obligations imposed on us, under the clear conviction that in doing so we have presented to you the true test by which you will apply the evidence to the case; but you will distinctly understand that you are the judges both of the law and fact in a criminal case, and are not bound by the opinion of the court; you may judge for yourselves, and if you should feel it your duty to differ from us, you must find your verdict accordingly. At the same time. it is our duty to say, that it is in perfect accordance with the spirit of our legal institutions that courts should decide questions of law, and the juries of facts; the nature of the tribunals naturally leads to this division of duties. and it is better, for the sake of public justice. that it should be so: when the law is settled by a court, there is more certainty than when done by a jury, it will be better known and more respected in public opinion. But if you are prepared to say that the law is different from what you have heard from us, you are in the exercise of a constitutional right to do so. We have only one other remark to make on this subject—by taking the law as given by the court you incur no moral responsibility; in making a rule of your own there may be some danger of a mistake.

These remarks apply to the expositions of the act of congress as made to you by the court; but if you are of opinion that the evidence in this case brings it within that act, or in others words, that in effecting the robbery of the mail the life of the driver was put in jeopardy, you have no discretion and no dispensing power, your oath makes the law your only guide to your verdict. You are not to look to its consequences or the punishment which may result; you only find that an offence has been committed. such as is defined in the law, and must be governed by the same rules of evidence. whether the punishment is death, fine or imprisonment. In all capital cases appeals are made to the feelings of jurors to induce them to be influenced by other considerations than such as grow out of the law and the evidence, but such appeals must be listened to with caution. It is for the national legislature to prescribe the

punishment of offence; it is not for you or us to arraign their justice or wisdom, and in performing our respective duties in the administration of criminal justice, we must go in the safe road prescribed by the laws as their expounders, but without assuming the power to repeal, alter, dispense or annul their provisions. It is the most painful duty imposed on us to become the agents through whose judgment punishment must reach an offender, but we must in all cases meet it with an honest and firm purpose, to do justice between the public and the accused, by an even, steady course. We cannot vary in the rules of evidence, accordingly as they apply to offences of greater or lesser degree of atrocity—no man can be convicted unless on clear and satisfactory proof of guilt. If a jury have a reasonable, well founded doubt of guilt, they must acquit of even the lowest offences—we know of no other rule for the highest. As to evidence, it must be the best the nature of the case and the ability of the party admits of, in cases of assault and battery; there can be no other rule in murder, unless it shall be required to prove the fact by some means of information more certain than human testimony. As to the law, it must meet the evidence and the case—whether it does so or not is for the court first and the jury afterwards to decide; but if it does, in their opinion, meet the case of the prisoner—obedience to the law is as much the duty of a citizen in the jury box as out of it. He violates every duty, if when his reason and judgment are entirely convinced of the guilt of the accused, he acts against such convictions from feelings of humanity, merely arising from the nature of the punishment; he does not, in the words of his oath, "a true verdict give according to the evidence." The degree of punishment cannot alter the weight of the evidence or the meaning and words of the law; and a jury are bound to render their verdict according to these alone, be the crime or its punishment what it may. We have made these remarks not from any belief that they are necessary for this jury, but from the hope that hereafter our attention may be more confined to the true subjects of our inquiry, and less directed to matters which are exclusively for the cognizance of a tribunal to whom is entrusted the enactment of laws defining and punishing offences.

Our attention has been called to other questions of law which may affect the prisoner's case. It is contended by his counsel that the act of congress under which he is on trial, being highly penal, ought to be construed strictly. This is a rule of construction of statutes as old and well established as law itself, and must be always borne in mind by courts and juries. It is founded on the tenderness of the law for the rights of individuals, and on the plain and universal principle that the power of punishment is vested in the legislature, and not in the judicial department—it is the legislature and not the court which is to

define a crime and ordain the punishment. [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 95, 96. But though the penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute, so as to exclude cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. Their intention is to be collected from the words they employ. If there is no ambiguity in the words, there is no room for construction. The court cannot depart from the plain meaning of a penal act of congress, in search of an intention the words do not suggest; but it is not enough to authorize a conviction under it that the case comes within the mischief or reason of a law, it must come within its provisions, and be one of the enumerated cases for which it inflicts a punishment; these are the rules settled by the supreme court, which we recommend for your adoption, as safe and unerring guides. It has been contended that inasmuch as Samuel M'Crea, from whom the mail is alleged to have been robbed, has not taken the oath directed by the second section of the postoffice law, the prisoners have committed no offence in robbing him of the mail; but we cannot agree with the prisoner's counsel in this position; the words of the law are, "if any person shall rob any driver of the mail of the United States, or other person entrusted therewith, of such mail;" it does not say, who shall have taken the oath prescribed. We cannot think that because the oath has been omitted, it was the intention of the legislature that any person should be permitted to rob, steal and plunder the mail, letters and packets it contains, and put the life of the driver in jeopardy with impunity. If you are of opinion that M'Crea was a carrier of the mail, or entrusted with it, you ought to have no hesitation in saying that robbing him of the mail is the offence described in the law; to say otherwise would be to repeal and nullify it.

Another position has been taken by the prisoner's counsel, and very strongly impressed upon the court; it is this, that Wilson cannot be convicted on this indictment as a principal offender, unless he with his own hands committed the robbery, and put the driver's life in jeopardy by the use of dangerous weapons; that the proof of all these acts must be brought home personally to him; and that it is not sufficient if they were committed by Porter or Poteet in his presence, with his consent, direct aid and assistance. To support this position it is alleged, that by the postoffice law the offence of principal and accessory is distinct, punishable by different sections of the law, and that Wilson can be reached only by an indictment against him as accessory under the twenty-fourth section. It is certainly a correct legal principle, that an accessory cannot be convicted on an indict-

ment against him as principal; the offences are distinct, though the punishment may be the same, and so they are considered in this law—but it does not define what shall be the legal line of discrimination between the procuring of, advising or assisting in the doing or perpetrating any of the enumerated acts or crimes forbidden by the law, and the actually doing or perpetrating them. The rules laid down as to the meaning and legal import of words used in laws must be applied to this; if they have acquired it by long usage, judicial exposition and common acceptation by legislative adoption, they must be presumed to be so intended, unless a different sense is affixed to them by the laws in which they are found. There are no words in the law which have so acquired a more definite and specific meaning, than procure, advise and assist, as contradistinguished from the actual commission of a crime—the latter is the principal offence, the former only accessary. If a person does no more than procure, advise or assist, he is only an accessory; but if he is present, consenting, aiding, procuring, advising or assisting, he is a principal, and must be indicted as such. A crime may consist of many acts, which must all be committed in order to complete the offence; but each person present consenting to the commission of the offence, and doing any one act which is either an ingredient in the crime, or immediately connected with or leading to its commission, is as much a principal as if he had with his own hand committed the whole offence. You could not respect the laws of your country if they punished with less severity, or made any discrimination between the man who bound and held the victim and the one who gave a fatal blow—the robber who held the pistol to your breast, or the one who rifled your pockets—both are murderers, both are robbers, in the eye of the law, of reason and of justice. No principle can be better settled or ought to be maintained with more care than this. It would be in vain to pass laws for the prevention or punishment of crimes, if courts and juries were bound so to administer them as to require definite proof that a party accused committed every act necessary to bring them within the law, though it was manifest that it was the joint act of himself, and associates who took an active part in the actual perpetration: there is no such rule in our jurisprudence. The one contended for by the prisoner's counsel is only applicable to cases unknown to the United States. In England there are felonies which are punishable with death, unless the parties accused are entitled to the benefit of clergy, which exempts them from that punishment—there are cases in which by the statutes of that country the party is deprived of this benefit—and these statutes are construed with extreme strictness out of tenderness towards human life. But this principle is not applied to new created statutory felonies. They possess, in England, all the incidents which appertain to felony by the rules and principles of the common law, one of which is, that all those who are present, aiding and abetting when a felony is committed, are principals. This has never been questioned there; the principle has been adopted here, and has become one of universal application. 4 Burrows, 2073, 2083; [U. S. v. Gooding] 12 Wheat. [25 U. S.] 460, 467. That it fully meets the case now on trial, we have not a doubt, provided you believe the witnesses who have been examined. If Wilson was one of those who formed a plan of robbing the carrier of the mail, of the mail; if all were present; if each consented to the commission of the robbery, took any part in effecting it, or did any act tending to its commission, all are principals, and in an equal degree. It is wholly immaterial which held or stopped the horses, threatened the driver, held the pistol at him or took the mail from the boot, all the various acts in relation to the driver and the mail constituted the crime, of which each was as completely guilty as if he had effected it unassisted. Each one put the driver's life in jeopardy with dangerous weapons, whether they were used by himself or accomplice. It is hard to decide which took the most efficient part in the scene; the night was dark, and it was impossible for the driver or the passengers to identify which of the three committed the various specific acts which have been detailed. They were all unknown, and they took especial pains to conceal their persons from observation. The confessions of Wilson and the evidence of Poteet, if believed by you, fill every chasm in the testimony, which, in point of law, in our opinion, brings each of them within the express provisions of the law. But whether they are so in fact is your exclusive province to decide. Our duty ends on this part of the case by instructing you as to this law.

There are four questions for your consideration: 1. Was the carrier of the mail robbed of the mail at the time and place referred to? 2. Was it effected by putting the life of the driver in jeopardy? 3. Was it done with dangerous weapons? 4. Was it done by the prisoner, or by any of the others in his presence with his aid or assistance? If you can with a safe conscience answer these questions in the affirmative, your duty is plain—to say so by your verdict of guilty. If you have reasonable doubt you must acquit, but the doubt must be a real, honest one, whether the acts charged have been committed by the prisoner or in his presence and with his aid or consent. They must not be doubts about the policy, justice, or binding power of the law, or in any way growing out of the degree of punishment which may follow conviction.

In the case of Porter.

THE COURT (BALDWIN, Circuit Justice) charged the jury. He explained the law and recapitulated the evidence, as far as it ap-

plied. in much the same terms as those used in Wilson's case, and then proceeded:

These are the remarks made by the court in their charge to the jury in the case of Wilson. The course taken in this case makes it necessary to say something more. The robbery of the passengers is no offence against the laws of the United States of which this court has any jurisdiction—we cannot try, still less punish, this offence; it is within the exclusive jurisdiction of the courts of Pennsylvania, with which we claim no right to interfere. But thus far it is a proper subject for your consideration in this case. Taking the whole transaction, from its commencement to the end, you must view it as one connected series of acts properly given in evidence. to enable you to decide on the matters directly under your consideration. As a part of the transaction, the robbery of the passengers is material, as tending to furnish evidence of the nature, character and design of the threats to the driver. the use of pistols. and the robbery of the mail. Thus far, and no further, will you consider it.

It is contended, that inasmuch as the indictment charges a robbery. of the mail. the evidence must show that the whole mail must be robbed; that though robbing part of the mail is the same offence, yet the indictment not so laying the robbery, the defendant cannot be convicted. It is said that by mail, the law means all the bags then in the stage, containing letters, papers, or packets. We cannot assent to this proposition. By a mail is meant, a bag, valise, or portmanteau. used in the conveyance of letters. papers, packets, &c., by any person acting under the authority of the postmaster-general, from one postoffice to another; each bag so used, is a mail, of which there may be several in the same vehicle—as the way mail, the general, the letter, or the newspaper mail. We can conceive no reason why the law should be construed otherwise. If a man should rob the carrier of the great southern, western or eastern mail bag, would it comport with common sense to say that because a small way mail bag had escaped the notice of the robber. he had not robbed the mail, and must go unpunished? Can you seriously believe that such was the intention of congress, or that the words they have used can justify the imputation to them of such consummate folly? If you do, then the crime of mail robbery may be expunged from the statute book; for the insignificant mail will always be left untouched. The court have no doubt that robbing the person entrusted with any one bag, valise or portmanteau, used for the purposes aforesaid, is a robbery within the express words of the law. Taking it from the driver's box, and throwing it into the road, cutting it open in the manner described, is robbery, if you believe the testimony. The twenty-third section of the law punishes the cutting of a bag, &c., with intent to steal or rob even a newspaper; it would be truly a strange conception of the preceding section to say that a wholesale robbery of the bag and all its contents was no offence at all.

It is said there can be no jeopardy by the use of dangerous weapons till the pistol is discharged; but there is no danger to the driver if it is not directed at him; or with a ball in it, discharged at him without hitting him, or not in a dangerous or vital part; the loss of an arm or leg may not put life in imminent danger; if the discharge did not take effect, it would seem to us, that the danger is less, for then there is no jeopardy of life,—but before the discharge, he could not foretell the extent of danger—it might take effect. Why then the actual discharge of the pistols should be made the criterion of jeopardy, we are utterly at a loss to conceive. In laying down a rule for the jury in Wilson's case, we stated that all who were present at the commission of an act, and assenting to it. were principles; we said that this was a rule of universal application; we repeat it now. and go further—it applies not only to crimes but to trespass and contracts. When two or more persons act together, in pursuance of a common object, one is answerable for the acts of the other tending to effectuate their common object. If this rule is broken in upon, it will derange the law in many of its most important provisions. As it affects criminal jurisprudence, it would go far to operate as a general jail delivery. No case can illustrate it more thoroughly than the one before you. Who robbed the carrier of the mail?—who robbed him, by putting his life in jeopardy, by the use of dangerous weapons? The night was dark; the robbers were unknown. Some one did one act, and some another; but each identical act was not done by one alone; there were three concerned and no more, and the deed was done by them in conjunction. If the prisoner's counsel are correct then, from the nature of the case there can be no conviction of any one, for no one with his own hands committed the whole offence. The law becomes a dead letter; future prosecutions will become useless. if, where one holds the horses, a second puts the pistol to the driver's head, and the third takes the mail from the box, all and each are not guilty. So, if we apply it to burglary, where one breaks open a dwelling-house in the night, another stands guard, and their comrades plunder it;—breaking and stealing make the crime. A did not break open the house; B did not plunder it; and C did neither—all must be acquitted. So, if one forges the plate of a bank note, and his associate the signature of the officers of the bank, and a third makes the paper, and a fourth strikes it off. Are you prepared to establish this as a feature which is in future to distinguish our Criminal Code? If you are, we have only to say it is a new one, and must be introduced without our concurrence. You cannot apply one rule to the capital and another to the lesser offence; it must have a general application or it can have none. It is neither in your power nor ours to go further. as to the law of any case, than to decide

upon what it was at the time the offence was committed. Courts are mistaken often. It is the frailty of humanity to err, and we can claim no exemption; but you must remember that in all governments of laws there is some rule by which its citizens must be guided. The constitution entrusts the making of laws to the representatives of the people: they are often unwise, sometimes unjust, and public opinion calls for their repeal by the same body which enacts them; but, until they are so repealed, courts dare not, and juries ought not, to disregard them. In us it would be an impeachable offence; and though a jury could be punished by no law, their moral offence would be no less than ours.

The constitution and laws of the nation have entrusted this court with the power of expounding the statute, and declaring the common law applicable to all offences within its jurisdiction; and it has not been thought proper to give to the supreme court any authority to revise our decisions on any of the matters now in issue before you. If we agree, our judgment is final; if we differ, we can certify the point of difference to the supreme court for their final determination. This is the only mode in which our errors can be corrected. We wish it were otherwise ordained, as it would relieve our minds from an awful responsibility; but we cannot shrink from it, when the duty is imposed on us under the highest obligations. In repeating to you what was said on a former occasion to another jury, that you have the power to decide on the law as well as the facts of this case, and are not bound to find according to our opinion of the law, we feel ourselves constrained to make some explanations not then deemed necessary, but now called for from the course of the defence.

You may find a general verdict of guilty or not guilty, as you think proper, or may find the facts specially, and leave the guilt or innocence of the prisoner to the judgment of the court. If your verdict acquits the prisoner, we cannot grant a new trial, however much we may differ with you as to the law which governs the case; and in this respect a jury are the judges of law, if they choose to become so. Their judgment is final, not because they settle the law, but because they either think it not applicable, or do not choose to apply to the case. But if a jury find a prisoner guilty against the opinion of the court on the law of the case, a new trial will be granted. No court will pronounce a judgment on a prisoner against what they believe to be the law. On an acquittal there is no judgment; the court do not act, and cannot judge, there remaining nothing to act upon. This, then, you will understand to be what is meant by your power to decide on the law; but you will still bear in mind, that it is a very old, sound and valuable maxim in law that the court answers to questions of law and the jury to facts. Every day's experience evinces the wisdom of this rule. In the case of Wil-

son, court and jury have passed on the questions of law, having no doubt of its embracing the case; we still adhere to our opinion, and cannot think otherwise. If this jury should differ from the former, can any man say what is the law of mail robbery as practically applied in this district? Where is the line which separates the guilty from the innocent in the transaction at Turner's lane? Is it the one drawn by the court from judicial decision, legislative adoption, and, to their minds, contained in the very words of the law, the one drawn by the prisoner's counsel in the zeal of their noble struggle to save a client's life, or the one recommended to you as deducible from the verdicts of juries in cases of murder, where the law and justice of the country may have been violated in obedience to supposed or prevalent public opinion. This case has assumed an aspect which places you and us in a most interesting and responsible attitude before the public. We have stated our deliberate and decided opinion on the whole law of this case. There is no tribunal authorized by law to revise or correct our judgment; not even the supreme court, on appeal or writ of error. Will you undertake to do what is forbidden to that high tribunal, which may decide questions arising between governments, but cannot decide this in any other event than our division of opinion? If you will, it may subserve the purposes of the defence; it may illustrate powerfully the humanity of the law in protecting prisoners from justice; but are you convinced in your minds and judgments, that you will declare the settled pre-existing laws of the land; that you will act on a rule which is a safe guide for the future, and better subserve the great purposes of public justice than what we have recommended? If you indulge feelings of humanity, in construing acts of congress, decide whether it shall be humanity to robbers and felons, or to the innocent victims of their avarice or revenge—the carriers of the mail; and whether you conscientiously believe that it was the intention of congress to protect, and save from the punishment prescribed by their own laws, the lives of atrocious offenders; or to protect the lives of those whose public duty exposed them to danger from their attacks. In a word, gentlemen, decide on the law and the facts as best comports with your sense of duty to the public and yourselves; act on the same rule under which you would be guided as a magistrate or judge on the oath and responsibility of office. Then you will not err. The court cannot but admire the efforts of intellect and eloquence made by the counsel for the prisoners. In going to the verge of their rights, in appealing from the court to the jury, they have acted in the strict line of their duty, from which they are under no obligation to depart; but you will judge whether you will be equally within the line of your duties in sustaining this appeal, and sanctioning the doctrines urged upon you with all the exertions of strong minds, brought in-

to action by warm hearts. In them to make the attempt is properly growing out of their professional situations; but your position is wholly different. All we can say to you is, reflect, deliberate, forget all appeals to your feelings, or any modes of operating on your judgment but such as are pointed out by the law or evidence.

On Thursday, May 6th, 1830, a motion was made by Mr. V. L. Bradford. junior counsel for Wilson, based on the alleged admission of irrelevant and irregular evidence at the trial, for a new trial; which THE COURT, after the hearing of argument from the counsel, overruled. A motion was subsequently made for arrest of judgment in both cases, and reasons filed in support of such motion. THE COURT was occupied several days in the arguments of counsel hereon. In overruling this motion THE COURT entered at length into the reasons filed, and the arguments relied on by the prisoners' counsel.

Both prisoners were found guilty, whereupon motions for new trials were made and overruled; motions in arrest of judgment were then made.

J. K. Kane.

1. The indictment is fatally defective, in not laying the offence to have been committed in a particular county in the district.

Every issuable fact must be set forth as committed in some village, hamlet or parish, as well as the county, so that a venire may issue to a jury of the vicinage. If the offence is laid in London, it is not sufficient without naming the parish, ward, &c. If laid in Guildhall, in London, it is not good. 1 Chit. Cr. Law, 132, 196, 200. It is enough to prove the commission of the act in the county, but the indictment must refer to a special venire, from which the jury are to come. 4 Durn. & E. [4 Term R.] 490; 5 Durn. & E. [5 Term R.] 162; 1 Rolle, Abr. 781; 2 Leach, Crown Cas. 800, 925; Archb. Cr. Pl. 12. If the facts stated are repugnant as to place or time, or are not stated, the defendant may demur or move in arrest. Yel. 94; Cro. Eliz. 97, 98; Cro. Car. 525; 2 Hawk. P. C. c. 25, § 77; 2 Hale. P. C. 180; 4 Com. Dig. "Indictment," 670. There can be no intendment after verdict. Archb. Cr. Pl. 14; 5 Durn. & E. [5 Term R.] 162. 628. The indictment must show a certain place. 4 Maule & S. 215. The omission of the words "then and there" is fatal. 3 Johns. Cas. 265, 266; 1 Madd. 26; 2 Keb. 583; 1 Vent. 60; 12 Mod. 88, 502; 2 Strange, 902. In capital cases the township, as well as county, must be laid. 7 Mass. 9, 13. So in misdemeanours, each constituent of the offence must be laid with a special venire. 1 Johns. 66, 75. The twenty-ninth section of the judiciary act directs that twelve jurors shall come from the county. 1 Story's Laws. 63 [1 Stat. 88]. The sixth amendment to the constitution directs that the trial shall be in a district designated by law, wherein the offence shall have been committed. This does not mean the general judicial district within which the court has jurisdiction, but the particular place or county from which the jury are to come. Hence the indictment must lay the county, so that the jury may be summoned thence, in analogy to the old rule in England, that four jurors, at least, must come from the parish. village or ward. Though this rule has become obsolete in England, it is adopted by the twenty-ninth section, and the record must show that the trial was had in the county; or if that was inconvenient, that twelve of the jurors come from the county named. The venire is a special one, and forms part of the record. 1 Bl. Comm. Append. 1. When no county is named, the clerk cannot make out the venire according to the act of congress. nor could we frame a plea to the jurisdiction, unless the county was named, for such plea must show what court could try the offence, and where it would be tried. 1 Chit. Cr. Law, 298, 439. The forms of indictments show the law to be so. 4 Chit. 476, 505. The practice is to summon twelve jurors from the county where the crime is committed. and issue separate venires in each case. U. S. v. Insurgents [Case No. 15,443]; U. S. v. Stewart [Id. 16,401]. A trial in the county is in the discretion of the court. U. S. v. Insurgents [Id. 15,442]; U. S. v. Fries [Id. 15,170]. But the indictment must lay the particular place, county and district, and the venire goes accordingly. 1 Burr, Tr. 352, 430. So it was done in the cases of Wood and Alexander, in which Judge Washington said, there would be a propriety in laying the county. Mail Robbers' Trial, 5, 6, 9, 196. It must appear by the indictment that the weapons were dangerous. Here it is not stated that they were loaded. Though the presumption may be that they were so in fact, that does not supersede the necessity of the averment. Vide U. S. v. Wood [Case No. 16,756]. The felonious intent of the prisoners, in putting the driver's life in jeopardy, does not appear; this is necessary, as in cases of treason, to show the intent in robbing the mail. U. S. v. Mitchell [Id. 15,789].

Dallas, Dist. Atty.

The time and place of the commission of an offence are immaterial, if they are so laid as to show the jurisdiction of the court. Though both time and place are specially laid, proof is sufficient of the act done at any time before the bill is found, and at any place within the district. 4 Com. Dig. 607. This indictment states the offence to have been committed in the Eastern district of Pennsylvania, within the jurisdiction of the court, and while the mail was proceeding from Philadelphia to Reading. It is not necessary to state the subdivisions which the state or local authorities have made of the district designated by the act of congress. There is a necessity for laying the district in this

court, to show that they have jurisdiction. So in England the county must be laid for the same reason. 1 Chit. 131, 94. But the township need not be laid, if it is not material to jurisdiction. 4 Bl. Comm. 306. Chief Justice Parsons gives the reasons why the county and parish must be laid in England, "because their limits are not prescribed by act of parliament, but depend on usage, of which the judges cannot judicially take notice;" and the rule does not apply where they are designated by law; hence it was held not necessary to lay the county, when the court judicially knew the township laid to be in the county. 7 Mass. 12. In reference to the criminal jurisdiction of the United States, the constitution looks only to the district which is designated by law as the place of trial; it knows neither counties, townships, parishes, vills, &c. The twenty-ninth section is only directory to the marshal in summoning the jury. A prisoner can suggest the county where the offence was alleged to be committed, and apply for a trial there, as in the case cited,—U. S. v. Insurgents [Case No. 15,442],—or may, at his option, waive the application. It is not a matter of right, but discretionary with the court, to direct the trial at any other than the ordinary place of its session,—U. S. v. Fries [supra]. If, as a matter of fact, the defendant has been deprived of any right at the trial, it would have been a mistrial; but he has in fact been tried by a jury of the county. The summoning of twelve men from the county, as directed by the twenty-ninth section, cannot refer to the indictment, which is found after the venire issues. The venire does not name the jurors, the marshal must summon twelve out of the forty-eight or sixty, as the case may be, and return jurors from such parts of the district, from time to time, as the court shall direct, so as to secure an impartial trial; the residence of the jurors appears on the panel annexed to the venire, and if any defect of jurors appears, the court can award a tales. In England the laying the vill, &c., has become obsolete, as the four jurors are no longer summoned from the place named. 1 Chit. 132, 196. When it ceased to be the law that the jury should be summoned de vicineto, and the statute directed they should come de corpore comitatus; from that time it becomes enough to allege a county for a venire. 3 Maule & S. 149. The construction of the constitution of this state directing an impartial trial by a jury of the vicinage, has been that it means the county, and the supreme court thus held that it is sufficient if the indictment shows that the court have jurisdiction, and can give judgment for the offence; the court presumes that the sheriff knows, and will perform his duty, if not, they will set aside the jury process. 6 Bin. 185. It is not necessary to lay the township, though the penalty goes in part to the supervisors. 4 Serg. & R. 450. Though there is no venue laid, yet if the jurisdiction appears on the

face of the indictment it is good. Cam. & N. 38; 3 Am. Dig. 170. The cases referred to in this court, and the case of Colonel Burr, were cases of treason, which are exceptions to the general rule, depending on the necessity of laying an overt act specially, and proving it as laid,—1 Burr, Tr. 563.—whereas, as a general rule, it is sufficient to charge the offence in the words of the law prescribing the punishment,—[U. S. v. Gooding] 12 Wheat. [25 U. S.] 460.

Joseph R. Ingersoll, in reply.

The prisoners have had a fair and impartial trial, but if there had been a mistrial, it would be a good ground to arrest the judgment. Cro. Jac. 284. There is greater reason for laying the locality of an offence in indictments in the federal courts, than in England, or the state courts, because many of the districts are as large as an European sovereignty. Laying the county is sufficient, as they are small; but from this indictment the court cannot know in what county the offence was committed: there are four counties between Philadelphia and Reading, and there are no jurors from the county of Berks; the defence is negative; if it turned on an alibi, the county might be very important, and therefore it should be referred to in the record. The court cannot look to the evidence, if the indictment does not show jurisdiction, and give notice of every matter necessary for them to act upon at the trial, or in giving the proper directions preceding it. 2 Hawk. P. C. c. 25. It must contain every requisite prescribed by the law, on the same principle which applies to the civil jurisdiction of the courts of the United States. The first proceeding is the indictment, the venire follows, or a distringas and a tales; but as twelve jurors must come from the county, it can only be ascertained from the indictment; as the prisoner is presumed innocent, he is not to name the county where the offence was committed. The panel shows where the jurors come from; the indictment shows where he is charged with committing the offence; the prisoner then knows whom to challenge; but if there is no venire, his right of challenge is impaired. At common law, the going to trial, in an action of trover, was no waiver of the want of a venire in the declaration. Cro. Eliz. 78. And in criminal cases there must be an express waiver of the right to a local jury, or it remains. 2 Hale, P. C. 193; 3 Mass. 133. Though the present is not a question of jurisdiction, it is an important one. In England the indictment lays the county to show jurisdiction, and as the general vicinage from which all the jurors must come; the vill, parish, &c., are laid to ascertain the particular place from which four are to be summoned,—1 Chit. 196; 3 Thom. Co. Litt. 505, Hargrave's note; the want of which is not mere form, but is good cause of challenge at the trial, and a mistrial, for which judgment will be arrested. Co.

Litt. 125a. Defects in venires are cured in civil cases, by 4 Anne, c. 16, § 6, but felonies are excepted by the seventh section. 4 Ruff. 206. Before this statute the consent of parties to an ejectment did not cure a defect in the venire. Hob. 5, 89; Cro. Eliz. 260. In New York, where the offence is laid in the city, the ward must be named. 7 Cow. 430. So must a parish be (by the note of the reporter), or the judgment will be arrested; and in England, though the statute 7 Geo. IV. has provided that the judgment shall not be staid on an indictment for such defect, where the court has jurisdiction, it may be still taken advantage of on demurrer, according to Car. Cr. Law, 44, 57. In civil suits it is enough to lay the venue in the county, where it is in a superior court of general jurisdiction; where the court has only a special jurisdiction, the place where the cause of action arose, must be specially laid so that jurisdiction will appear. 1 Chit. Pl. 280. When a jury are to be summoned from a particular vicinage, it must be laid. 3 Maule & S. 148. Where an indictment laid the offence at the parish of St. Mary, in the county of M., and there was no such parish, Lawrence, J., saved the point. 3 Camp. 77. The common law is in force in the circuit courts, as to the forms of indictments and pleadings, challenges to jurors, &c. U. S. v. Coolidge [Case No. 14,857]. Any defect in an indictment, or in the mode of setting out the offence, is fatal. 4 Chit. 44, 46; 2 Hawk. P. C. 185. Judgment will be arrested if there is no venire. 18 Johns. 212; 1 Wend. 117. So if the time of the offence is not stated,—9 Cow. 660,—though time is not essential unless in special cases, as in the assignment of perjury,—U. S. v. McNeal [Case No. 15,700]. The cases in this court on indictments for treason and mail robbery, and the case of Colonel Burr, are conclusive on the point.

BALDWIN, Circuit Justice. The counsel for the defendant has filed the following reasons in arrest of judgment. "1. That it does not appear in the indictment in what county the offence charged therein was committed. 2. That it does not appear with certainty in the indictment that the weapons therein charged to have been used by the prisoner, were dangerous weapons, inasmuch as it does not appear that the weapons therein set forth, viz., pistols, were loaded. 3. That the offence charged against the prisoner is not so described in the indictment as to make it certain, by reference to the statute of the United States, that judgment of death should pass against him. 4. That it does not appear by the indictment that the intent of the prisoner was felonious in the putting of the driver's life in jeopardy. 5. That the indictment is in many other respects defective and erroneous."

Having laid down the law to the jury, that it was not necessary to prove that the pistols were loaded, and that their use in the manner testified brought the case of both prisoners within the act of congress, the court has already decided on the second and fourth assigned reasons in arrest of judgment; we have no doubts as to the entire correctness of the opinion, and deem it unnecessary to repeat the reasons there given or to assign any new ones, as the shape in which they are now presented does not vary their legal bearing. The third and fifth are fully answered, in our opinion on the first.

The remaining exception to the indictment is one on which the court have bestowed their most serious and deliberate attention. In a capital case we would not pass sentence on a prisoner, where we entertained any doubts of his case coming within the law which inflicted the punishment, or of the sufficiency of the indictment on which he had been tried: we must be satisfied that he is guilty not only in substance and form as he is indicted, but that he is indicted according to the mode and in the manner prescribed by law. U. S. v. Gooding, 12 Wheat. [25 U. S.] 474. At the common law great nicety is necessary in the description of offences, and especially of capital ones. The rules which regulate this subject have, in former cases, been founded on considerations which no longer exist in our own, or English jurisprudence; but being once established, they still prevail, although if the case was new, they might not be incorporated into the law. But before we could be justified in declaring a rule of the common law of England, which was founded in no reason, or in such as was no longer operative there and was never applicable here, to be a part of the common law of the United States binding on this court, we ought to be well convinced that it has been adopted in the states before the organization of the federal government, or by the courts which have been brought into action under it. We should be the more cautious in giving way to an objection to an indictment which is founded in mere form, in a case where the words of an act of congress, defining and punishing an offence had been pursued, when it appeared to have been committed within the jurisdiction of the court, and when any further particularity would be of no possible benefit to the prisoner, or the result of it in any possible manner deprive him of the means of information necessary for a full defence. There are certain principles by which we must be governed in judging of the sufficiency of all indictments. They must contain a legal description of an offence, laid with such locality as to enable the court to judge, on the face of it, that they have power to punish for its commission. It is our duty to see that these requisites are complied with, as constitutional and legal provisions which we must obey. When, however, we are called upon to prescribe additional ones, we must find them in some law which controls us, before we can refuse to render judgment on a verdict

which has been rendered on a fair trial, on clear undoubted testimony and when the record contains all the form and substance required by any statutory provisions or decisions of any court acting under our laws. The only clauses on this subject to be found in the constitution are in the second section of the third article, declaring that all trials for crimes shall be in the state where the offence shall have been committted, and in the 6th amendment which says, "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

The only act of congress which can be relied on is the 29th section of the judiciary act, which provides: "That in cases punishable with death, the trial shall be had in the county where the offence was committed; or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence."· All these requisites have been complied with. The trial has been in the state, in a district previously ascertained by law, in the county where the offence was committed, from which twelve at least of the petit jurors have been summoned. The indictment alleges the offence in the words of the act of congress—charges on the prisoners the robbery of the carrier of the mail, proceeding from Philadelphia to Reading—to have .been committed within the Eastern district of Pennsylvania, and within the jurisdiction of this court. These facts being found true by the jury, give judicial knowledge that an offence has been committed, which is punishable by law, as well as at the place over which we have jurisdiction and power to try consistently with the constitution and amendment. We are bound to try all crimes committed within the district which are duly presented before us, but not to try them in the county where committed; that is a matter of which the court must judge in the exercise of their discretion,—U. S. v. Cornell [Case No. 14,868],—which does not require to be guided by the averments in the indictment. If the law was imperative that the trial must be in the county, the reasons might be very strong, and even conclusive, for requiring the county to be named; but being discretionary in the court, there would seem to be no necessity for the averment, as they had other means of knowing the place of the offence, which need be noticed only to direct their discretion, but not to give them power to try. When that is apparent from the record, and every legal requisition is met, we must inquire if there have been any. superadded by judicial authority. In the reports of cases in federal courts we find no decision that an indictment for capital crimes against the laws of the United States must lay the county in which it is committed. In the Case of Wood, for mail robbery, the objection was mentioned, but Judge Washington did not arrest the judgment on that ground, or give any opinion whether it was a fatal one or not. He contented himself with observing that there was a propriety in naming the county, in which we fully concur with him. But although there is always a propriety in avoiding any questions which the ingenuity of counsel may raise, it by no means follows that the averment was necessary in his opinion. This appears to be the only case in which the question raised before us has been distinctly proposed before any court of the United States, but there are others in which principles very strongly analogous have arisen and been settled. The third section of the act of the 30th of April, 1790, affixes the punishment of death to any crime of murder committed in any fort or place under the exclusive jurisdiction of the United States. One Connell was indicted for the murder of William Kane in Fort Adams, in Newport harbour, which was alleged to be a place within the sole and exclusive jurisdiction of the United States. He was convicted, and sentenced to be executed. The principal question was as to the jurisdiction of the court. In order to give it, the murder must have been committed within the exclusive jurisdiction of the United States. It was so considered by Judge Story both in his charge to the jury and in overruling the motion for a new trial. It does not appear that the act was charged to have been done in the county of Newport; indeed it could not have been so, for this learned judge declares, that "strictly speaking, it was not within the body of any county of Rhode Island, for the state had no jurisdiction there." It could not then have been necessary to have so laid it; yet the trial seems to have proceeded according to the provisions of the twenty-ninth section of the judiciary act. Sixteen jurors were summoned from the county of Newport, and the various points growing out of that act were fully considered by the court. Though they gave no direct opinion on the question now under consideration, they gave a judgment in a case where the record must have directly presented it. It seemed sufficient that the case came within their jurisdiction by the commission of the crime within a fort, and so laid. This case is also an authority in answer to the arguments in favour of this objection drawn from the twenty-ninth section, that as twelve jurors must be summoned from the county, it must be alleged in the indictment, as a guide for the venire. In that case the prisoner's counsel urged that the venire could not issue till the prisoner had pleaded. The court instantly overruled the objection as forming no part of the issue before the jury: as also the one taken on the ground that the trial ought to have been had in the county of Newport, and for the same reasons. If then the commission of the offence in the county formed no part of the issue, it clearly follows that it would not be a material averment in

the indictment, the court having jurisdiction without it.

In general, it is sufficient if the indictment sets forth an offence in the words of the statute creating it, or as defined at common law, without the particulars of the manner or means, place or circumstance. "The case of treason stands upon a peculiar ground; there the overt acts must by statute be specially laid, and must be proved as laid." U. S. v. Gooding, 12 Wheat. [25 U. S.] 473, 475. It is evident that the law was so considered by the chief justice on the trial of Colonel Burr. He observes: "In considering this point the court is first led to inquire whether an indictment for levying war must specify one overt act, or would be sufficient if it merely charged the prisoner in general terms with having levied war, omitting the expression of place or circumstance. The place in which the crime was committed is essential to an indictment, were it only to show the jurisdiction of the court. It is also essential for the purpose of enabling the prisoner to make his defence." It was held in that case to be necessary to lay the particular manner in which the war was levied; "that an overt act must be averred and proved at the place alleged in the indictment, no other overt act can be inquired into except for the purpose of proving the particular fact charged, it is as evidence of the crime consisting of this particular fact, not as establishing the great crime by a distinct fact. The overt act charged is the sole act of that treason which can produce conviction. It is the sole point in issue between the parties." These are rules of the law of treason in levying war both in England by their statute, and in the United States by the act of the 30th of April, 1790, which has this expression in the section punishing treason: "and shall be thereof convicted by confession in open court, or on the testimony of two witnesses to the same overt act, of the treason whereof he or they shall stand indicted," following mostly the words of the third section of the third article of the constitution. The requiring the overt act of levying war to be specially laid, is an exception to the general laws of treason in England, growing out of the statute of Edw. III., which directs it as to this species of treason; but as to that which consists in counterfeiting the coin, does not require it, and it need not be laid. The same rule must apply to the constitution and act of congress, as treason consists only in levying war, and is the only crime in our Code which must be proved by the commission of the specific act. in the manner, place and circumstances as charged in the indictment.

The act of congress on the subject of trial in the county, and the summoning of jurors, can have no bearing on the forms of this indictment, for the place of trial is discretionary with the court, and by the uniform practice in Pennsylvania, before the passage of the judiciary act, and of this court

ever since, the venire issues before the indictment is found. The jury cannot take these matters into their consideration, as they form no part of the issue of guilty or not guilty; they cannot inquire into the sufficiency of the reasons which induced the court to refuse a trial in the county, or whence the jurors come; these are matters which the court will so regulate as to do justice to the prisoner on any objections made by him to the panel, but they cannot in any manner affect the indictment, which is presented after the jury are summoned. and cannot of course serve as a guide to the marshal in executing the venire. If he shall not have summoned the requisite number from the county, and the prisoner insists on his right, the court may continue the cause. or direct a return of the proper number from such county or part of the district as shall be most favourable to an impartial trial. This part of the twenty-ninth section of the judiciary act fully meets every exigency which may arise at the trial, and in our opinion furnishes a very satisfactory answer to all the arguments which are founded on the preceding provisions contained in that section. The case of People v. Barrett, 1 Johns. 66, does not sustain the position assumed. It was decided in that case that the offence must be laid in the county, not that it must be laid in the township. The true reason for the judgment of the court was assigned by Justice Spencer. "it did not appear that the essence of the offence was committed in the county," and leaves the present question untouched; for the county, in a state court, means no more than state or district in this; which is, that it must appear to be within their respective jurisdictions. The one from Massachusetts seems to us to be more in direct opposition to the principle asserted. It was decided in that case that an indictment for not repairing a road was good, although it did not lay the offence to be in the county; it was held to be sufficient to say the township, because, as judges, they knew from the several public statutes of the state that the township of Springfield lay wholly in the county of Hampshire. The eminent judge (Parsons) who delivered the opinion of the court, declared that "the objection by the common law of England might prevail, because the judges cannot presume that the whole of the township or parish lies in the same county. In England the limits of the several townships and parishes are not ascertained by public acts of parliament, the records of which are remaining, but are determined by ancient usage, of which the judges cannot judicially take notice. The case is different in Massachusetts: our county limits are prescribed by public statutes; of which we are bound judicially to take notice." 7 Mass. 9, 12. In referring to the law of Pennsylvania, as it was at the time of the passage of the judiciary act, we find

that robbery was a capital offence: the punishment was altered in 1790, but the laws as to the form of the indictment did not change with the change of punishment. The act of assembly of 1777 adopted so much of the common law of England as had heretofore been in force in the province. 1 Dall. St. Laws, 723. But that part of it which relates to this question does not appear to have been in force before the Revolution, but a different rule must have prevailed. From the early periods of our judicial history, the uniform practice in the criminal courts has been to lay the county, and not the township. Such are the forms yet in use in cases of murder. The only reported case to be found in which an objection was made that the township was not alleged, was in Duncan v. Com., on an indictment for adultery. It was said to be necessary, because the fine was to be divided between the commonwealth and the supervisors of the township in which the defendant resided, according to the provisions of the law punishing the crime. The court held it "not necessary. because they could ascertain the place of the defendant's residence otherwise than by the verdict of a jury." 4 Serg. & R. 450. If there was any case in which there could be reason for laying the township, it was this; but it has never been decided in Pennsylvania that it was necessary in any. The practical construction of that part of the constitution requiring a trial of all offences by a jury of the vicinage, has been, that it is fully complied with by a trial by a jury of the county.

We have then, in this case, the authority of the supreme court of Pennsylvania added to all that has been referred to, and, on a deliberate consideration of the subject, are clearly of opinion that the objection taken to the indictment in these cases cannot be sustained. If we entertained a doubt, we would certify the case to the supreme court; but feeling none, it is our duty not to delay public justice. We have carefully reviewed all the proceedings on the trials. and can find nothing, in our opinion, in the least erroneous. Had we doubted in the least the correctness of our decision on any point which arose, we would have given the prisoners an opportunity of another trial; but we have had none. The evidence was clear, uncontradicted and conclusive. The guilt of the prisoners was apparent, and ascertained after a long, laborious and impartial trial, in which they were defended with all possible ability and exertion. The jury was satisfied on all questions of fact; we are equally so on those of law, arising on the trial or apparent on the record, and therefore overrule the motion in arrest of judgment.

[NOTE. Subsequently the cause went to the supreme court upon a certificate of division of opinion upon a question as to the admissibility of a pardon by the president of the United States,

which question arose upon the motion for sentence. See 7 Pet. (32 U. S.) 150.]

[NOTE, from 1 Baldw. 607.] In the case of Leland v. Wilkinson, reported in 6 Pet. [31 U. S.] 317, 322, the supreme court seem to have disaffirmed the principle on which the pardon was admitted in the case of United States v. Wilson and Porter. A paper purporting to contain copies of the proceedings of the legislature of Rhode Island in various cases from 1784 to 1827. authorizing the sale of the real estate of decedents for the payment of debts, was offered to the court to be read as evidence of the usage and law of the state. To the copy of each proceeding was annexed the following certificate: "True copy of the petition and vote (or order) thereon, and all the papers and documents on file. Witness, Henry Bowen, Secretary." The copies were connected together with the certificates, to which was annexed the following certificate, with the seal of the state affixed. "By his excellency, Lemuel H. Arnold, governor, captain-general and commander-in-chief of the state of Rhode Island and Providence Plantations. Be it known that the name 'Henry Bowen,' to the aforewritten attestations subscribed, is the proper handwriting of Henry Bowen, Esq., who, at the time of subscribing the same, was secretary of the state aforesaid, duly elected and qualified according to law; wherefore unto his said attestation full faith and credit are to be rendered. In testimony whereof I have hereunto set my hand, and caused the seal of said state to be affixed, at Providence, this seventh day of January, in the year of our Lord one thousand eight hundred and thirty-two, and independence the fifty-sixth. Lemuel H. Arnold. By his excellency's command, Henry Bowen, Secretary. (Seal.)" The paper was rejected by the court for the reasons stated by the judges. The following dissenting opinion was delivered, which will fully explain the grounds of the decision in the circuit court, as to the effect of an authentication of a paper by the great seal of a state. [See dissenting opinion of Mr. Justice Baldwin in Leland v. Wilkinson, 6 Pet. (31 U. S.) 321.]